EXHIBIT A

Casse 1:08-cv-03741-LTS-MHD   Document 173-4   Filed 09/25/09   Page 2 of 20

Page 1

```
 1              Deposition of James Pappas
 2            UNITED STATES DISTRICT COURT
 3           SOUTHERN DISTRICT OF NEW YORK
 4        ------------------------
                                  )
 5    KATERINA PLEW,              )
                                  )
 6         Plaintiff,             ) Case No.
                                  )
 7         vs.                    ) 08-CV-3741(LTS)(MHD)
                                  )
 8    LIMITED BRANDS, INC.,       )
      INTIMATE BRANDS, INC.,      )
 9    LIMITED BRANDS STORE        )
      OPERATIONS, INC.,           )
10    VICTORIA'S SECRET STORES    )
      BRAND MANAGEMENT, INC.,     )
11    VICTORIA'S SECRET DIRECT    )
      BRAND MANAGEMENT, LLC       )
12    AND VICTORIA'S SECRET       )
      STORES, LLC,                )
13                                )
           Defendants.           )
14        ------------------------
15              DEPOSITION OF:  JAMES PAPPAS
16                DATE:  May 5, 2009
17                     HELD AT:
18             The Holiday Inn Hotel
19         700 Main Street - Shippan Room
20              Stamford, Connecticut
21
22                     - - -
23
24         Reporter:  SUE A. TERRY, RPR/CRR
25
```

1          Deposition of James Pappas

2      Q.   Well, let me ask you again maybe

3   differently, just so I understand.

4           Supposing you were going to now source a

5   new product from a manufacturer, how would

6   the -- again, if you can generalize, how would the

7   negotiation happen?

8      A.   It would depend on the product and whether

9   the product -- where the product idea came from,

10   what type of product it was, what vendor has the

11   capability, what price you were looking for from the

12   manufacturers.

13      Q.   It's specific to each vendor how that

14   product would go?

15      A.   Specific to each product.

16      Q.   Specific to each product.  Now, we've gone

17   through the Senior VP, Design Operations title, and

18   that takes us through 2005, as close as you can

19   recall?

20      A.   Uh-huh.

21      Q.   At some point in 2005, you became

22   Executive Vice President for Production Sourcing?

23      A.   Right.

24      Q.   Do you know roughly month and year or even

25   just the year -- what the period of that job was?

Page 17

1            Deposition of James Pappas

2      A.   When it stopped, probably 2007

3  or '08 -- late '07 or early '08.

4      Q.   Okay.  And can you tell me how your job

5  responsibilities changed in that job?

6      A.   At that job, I was the head of all of

7  production and sourcing.

8           So my responsibility was to make sure that

9  the product was manufactured properly and shipped

10  properly.

11     Q.   I guess I should've asked you this it at

12  the beginning, but through all the jobs that we have

13  talked about, were those focused on bras, on -- or

14  were they across all products?

15     A.   It was intimate apparel.

16     Q.   That was the case in all the jobs we've

17  discussed so far?

18     A.   Correct.

19     Q.   So that would -- I take it that would

20  include anything that -- what I'm going to refer to

21  grossly as "underwear"?

22     A.   Yes.

23     Q.   Okay.  Now, during that period -- and I'm

24  talking about the 2005 to 2007 or early 2008

25  period -- did you then come to have someone you

1              Deposition of James Pappas

2      A.   I didn't have much of a role in that one.

3   It was designed -- it was a small quantity -- I

4   mean, relatively for us.

5           It was a small quantity, so I didn't have

6   much involvement in that one.

7      Q.   Okay.  Did you have any direct contact

8   with anybody at DBA?

9      A.   On that bra, no.

10     Q.   Had you had contact with someone at DBA on

11  other bras?

12     A.   No, I talked mostly with DBA about overall

13  strategy of the business.

14     Q.   And who was your primary contact at DBA?

15     A.   Elis Poleg.

16     Q.   And is that a man?

17     A.   Yes, it's the CEO.

18     Q.   That person is the CEO, right.  Other than

19  Shock Absorber -- well, I should back up and ask the

20  question.

21          Was Shock Absorber also sourced from DBA?

22     A.   Yes.

23     Q.   Other than Shock Absorber and the 100-Way

24  Bra, were there any other products sourced from DBA?

25     A.   I don't know.  I don't recall.  There may

```
 1              Deposition of James Pappas
 2   diligence process that it goes through to be sure
 3   that the vendor is a good partner to do business
 4   with?
 5       A.   Yes, it's the preproduction process.
 6       Q.   Can you explain to me what the elements of
 7   that process are?
 8       A.   You have to make sure that the product is
 9   producible in a bulk production environment at a
10   certain price.
11       Q.   Is there any due diligence with respect to
12   the -- wherever the design comes from?
13            That's a terrible question.  I'll try it
14   again.
15            Is there any due diligence with respect to
16   the design ownership of the product you're
17   acquiring?
18       A.   Yes.  It depends on the product.  If a
19   product is designed internally, it's not usually an
20   issue.
21       Q.   Sure.  To the extent it's designed
22   externally, is there a due diligence to make sure
23   the vendor owns the design they are selling you?
24       A.   That's covered in the Master Sourcing
25   Agreement.
```

1            Deposition of James Pappas

2            And the stipulation is clear, in that, if

3    you bring a design to us, the onus is on the vendor

4    to make sure that that design is, in fact, owned by

5    them.

6        Q.   We'll talk about that agreement in a

7    second.

8            But other than the requirement -- other

9    than the contractual requirement and Master Sourcing

10   Agreement, does Victoria's Secret or any of the

11   other Victoria's Secret entities engage in any kind

12   of due diligence process on its own?

13       A.   No.

14       Q.   Now, turning to the Master Sourcing

15   Agreement, are you aware that it has an

16   indemnification provision?

17       A.   Explain it, please.

18       Q.   Well, do you know what "indemnification"

19   means?

20       A.   Not in this case, no.

21       Q.   Let me show you some documents.

22       A.   Okay.

23            MR. von SIMSON:  We have been going

24   about an hour.

25            Do you want to take five minutes?

James Pappas

```
 1              Deposition of James Pappas
 2              THE WITNESS:  I'm fine.
 3              MR. von SIMSON:  I'm going to show
 4    Mr. Pappas three documents that have already been
 5    marked in this case as Exhibits 33, 34 and 35.  I'm
 6    handing those to the witness.
 7    BY MR. von SIMSON:
 8         Q.   I'll just ask you about each of these, in
 9    turn -- and again, take your time.  I'll just start
10    with Exhibit 33.  Feel free to look at this as long
11    as you would like to.
12              My question for you is going to be:  Is
13    this -- I'll say for the record that Exhibit 33 is a
14    cover letter covering a document called "Purchase
15    Terms Apparel."
16         A.   Uh-huh.
17         Q.   Now, you've identified, I know, a Master
18    Sourcing Agreement.
19              Have you ever seen this document or a
20    document like this before?
21         A.   No.
22         Q.   Okay.  And let's look at Exhibit 34.  I'll
23    ask the same question:  Have you ever seen this
24    document or a document like this before?
25              And I should say, 34 is a cover called
```

Page 43

1          Deposition of James Pappas

2     "Third-Party Brand Vendor Agreement," and then

3     second page says, "Addendum Number One, General

4     Sourcing Terms."

5          A.   Yes, I have seen this.

6          Q.   Okay.  And what does this -- when is this

7     agreement used?

8          A.   I believe this is used when we're doing

9     business with a vendor with commercialized

10    product --

11         Q.   Okay.

12         A.   -- their design.

13         Q.   Now, I'll just have you look -- and again,

14    the same request that you take as long as you want

15    to review this document.

16              But I'm going to direct your attention to

17    paragraph fifteen, which has two parts, A and B,

18    "Indemnity Insurance."

19         A.   Yes.

20         Q.   And I'll just ask you to look at that to

21    the extent you need to and tell me if, having looked

22    at that, you have any understanding of what that

23    paragraph means?

24         A.   Yes, I am familiar with that.

25         Q.   Okay.  And what's your understanding of --

Page 44

```
 1              Deposition of James Pappas
 2      A.    The understanding is that the vendor is
 3  fully responsible for any issues that come up, and
 4  the buyer -- meaning Victoria's Secret -- is not
 5  regarding the sale of the product.
 6      Q.    Okay.  And would that include a lawsuit
 7  like this one for an infringement of a patent?
 8      A.    That is my understanding, yes.
 9      Q.    Do you know whether or not Victoria's
10  Secret asked DBA to indemnify it in this case?
11      A.    I called Elis Poleg and said "Per the
12  terms of our agreement, we consider DBA to be fully
13  responsible.  And I don't know what's going to
14  happen, but just be aware that this is a lawsuit."
15      Q.    And what did he respond?
16      A.    I think his response was something to the
17  effect of, "Well, you know, that's our product.
18  Don't worry about it," or something to that effect.
19      Q.    Well, but did DBA indemnify Victoria's
20  Secret in this case?
21      A.    I don't know.
22      Q.    Were you ever part of any discussion in
23  which someone said, "DBA should be paying for our
24  defense costs in this case"?
25      A.    That discussion was the one I was part of,
```

James Pappas                                          5/5/2009

```
 1              Deposition of James Pappas
 2    62 -- and I have done this.  I have cut away the
 3    lining of that bra.
 4         A.   Uh-huh.
 5         Q.   You can see there's sort of a mesh strip
 6    inside it?
 7         A.   Yeah.
 8         Q.   Do you know what feature that strip
 9    performs?
10         A.   That's a support that holds the breast.
11         Q.   Does that perform an uplift function, to
12    the extent you know?
13         A.   I don't know in this bra whether it does
14    or not.
15              Typically, that's either for uplift or
16    support.
17         Q.   That mesh inner lining?
18         A.   The extra inner lining, yes.
19         Q.   Do you know whether or not that has a
20    name -- that feature?
21         A.   No.
22         Q.   Do you know Marie Zarkadas?
23         A.   No.
24         Q.   Did you ever meet her?
25         A.   No.
```

1              Deposition of James Pappas

2      Q.   Have you ever spoken to her personally?

3      A.   No.

4      Q.   Now, I take it -- well, let me ask you:

5  Did you ever receive a telephone call from her?

6      A.   I think I received a phone call and an

7  E-mail.

8      Q.   Okay.  Do you recall roughly when those

9  occurred?

10     A.   In 2006, I believe.

11     Q.   Okay.  And do you recall whether or not it

12  was a phone call or an E-mail in the first instance?

13     A.   I actually thought they were phone calls.

14  But I saw an E-mail yesterday, which made me say,

15  "Oh, it was an E-mail."

16          So I don't know if it was a phone call or

17  E-mail.  I know there was at least one E-mail.

18              MR. von SIMSON:  Okay.  Let me -- I'll

19  ask the reporter to mark now Exhibit 65.

20              (Whereupon, Pappas Exhibit 65:

21  Marked for identification.)

22  BY MR. von SIMSON:

23     Q.   Is this the E-mail you were talking about

24  a minute ago?

25     A.   Yes.

Page 58

```
 1              Deposition of James Pappas
 2       Q.   Now, this indicates -- I'm just going to
 3   read the first sentence.
 4            "Unfortunately, I wasn't able to connect
 5   with you."
 6            This is an E-mail -- I should identify for
 7   the record, Exhibit 65 bears VS 002115 from Maria
 8   Zarkadas to Jim Pappas, dated May 1st, 2006.
 9            And the Subject is:  "You Won't Regret
10   This, We Promise."
11            In this case, it says, "Unfortunately, I
12   wasn't able to connect with you when you returned my
13   call last Wednesday."
14            Do you see where it says that?
15       A.   Yes.
16       Q.   Looking at this, does this refresh your
17   recollection as to whether or not you called
18   Ms. Zarkadas?
19       A.   I can only assume I did based on this.  I
20   don't recall calling her.
21       Q.   You don't recall having received a call
22   from her?
23       A.   No.
24       Q.   Now, at or about this time, did you
25   receive any materials from Ms. Zarkadas?
```

```
 1              Deposition of James Pappas
 2       A.   Yes, she sent over a package.
 3       Q.   And was it a paper package or was it an
 4   E-mail attachment?
 5       A.   A paper package.
 6       Q.   Do you recall what was in that?
 7       A.   I sent it over to the attorneys.
 8       Q.   Did you open it?
 9       A.   I did not.
10       Q.   Now, did there come a point where you
11   agreed to meet with Ms. Zarkadas?
12       A.   Yes.
13       Q.   And was that sometime after this it
14   E-mail?
15       A.   That was prior to this, I believe.
16       Q.   Okay.  And how did you arrange that
17   meeting?
18       A.   Through my assistant.
19       Q.   Okay.  And I take it -- well, did that
20   meeting ever take place?
21       A.   No.
22       Q.   Why not?
23       A.   When I saw this E-mail, which I thought
24   was a phone call -- when I saw this E-mail and I saw
25   the part about Maidenform, it scared me to think
```

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

James Pappas                                                    5/5/2009

Page 60

```
 1              Deposition of James Pappas
 2   this wasn't a real, new idea.
 3              And I immediately called Carol Matorin,
 4   and she said, "Don't have that meeting.  That's our
 5   policy," and canceled me.
 6       Q.   Okay.  But before this, did you think it
 7   was a real, new idea?
 8       A.   I thought there was a possibility that it
 9   was.
10       Q.   And what was the basis for you drawing
11   that conclusion?
12       A.   Someone saying, "I've got this great, new,
13   revolutionary idea."
14       Q.   And without knowing what the idea was, you
15   scheduled a meeting with Ms. Zarkadas?
16       A.   Yes.
17       Q.   And this was the first time anybody ever
18   sent you an unsolicited idea?
19       A.   Yes.
20       Q.   So, again, I just want to -- I'm going to
21   try and understand the chronology of this the best I
22   can.
23              Is it your recollection -- just tell me if
24   you can't recall -- whether the first contact was by
25   phone or E-mail from Ms. Zarkadas?
```

Page 61

```
1              Deposition of James Pappas

2        A.   I don't remember.

3        Q.   And then you at some point called her; is

4    that right?

5        A.   Only -- it looks like I did.  I don't

6    recall calling her.

7        Q.   Okay.

8        A.   It could have been my assistant who

9    called.  I don't know.

10       Q.   Was it before or after that call that you

11   received this package from her?

12       A.   After which call?

13       Q.   Well, to the best we can tell, somehow,

14   she made initial contact with you.

15            Then this E-mail seems to indicate that

16   you called her back.

17       A.   Uh-huh.

18       Q.   Do you recall when in relation to those

19   two contact points you received a package?

20       A.   After; the package came after.

21       Q.   Came after this E-mail?

22       A.   As I recall, yeah.

23       Q.   Okay.

24       A.   To be honest, I don't recall.

25       Q.   Okay.
```

1            Deposition of James Pappas

2      A.    I say that, because I spoke to Carol

3   Matorin, who said, "Don't talk to anybody."

4            And then I got a package and I sent it

5   Carol Matorin.

6                 MR. WARD:  I would just like to

7   caution you not to divulge specific legal advice

8   that your counsel may have provided to you.

9                 THE WITNESS:  Okay.

10  BY MR. von SIMSON:

11     Q.    Did Ms. Matorin provide specific legal

12  advice to you?

13                MR. WARD:  You can answer that yes or

14  no.

15                THE WITNESS:  What's the definition of

16  "legal advice"?

17                MR. WARD:  If you asked her an opinion

18  on a legal matter and she provided it, as opposed to

19  asking about a policy or things like that.

20     A.    No, she advised me about policy.

21  BY MR. von SIMSON:

22     Q.    What advice did she provide about the

23  policy?

24     A.    That you should -- that the policy is, we

25  should not be meeting unsolicited vendors, and we

```
 1              Deposition of James Pappas
 2      A.    I didn't recall that until I saw that, but
 3   it seems like that's right.
 4      Q.    Okay.  So you have no --
 5      A.    I'm assuming that that's correct.
 6      Q.    But do you have any independent
 7   recollection of whether or not you scheduled an
 8   appointment with Ms. Zarkadas?
 9      A.    Definitely not.
10      Q.    Then based on something, you thought that
11   she might have a good idea; is that right?  We don't
12   know what it is?
13      A.    Uh-huh.
14      Q.    But you did draw that conclusion based on
15   whatever; is that correct?
16      A.    I assume that's the case.  I don't recall,
17   but if I set up a meeting -- if I set the meeting
18   up, that would be the reason I set it up; yes.
19      Q.    Okay.  And then, again, I believe you
20   testified sometime following this E-mail -- Exhibit
21   65 -- you received a package from Ms. Zarkadas; is
22   that right?
23      A.    Yes.
24      Q.    Okay.  And it was a paper package?
25      A.    Uh-huh.
```

James Pappas                                                      5/5/2009

Page 101

```
 1              Deposition of James Pappas
 2      Q.   And was it sent by --
 3      A.   It was an envelope of some sort.
 4      Q.   And you didn't open that?
 5      A.   No.
 6      Q.   And why didn't you open it?
 7      A.   Because I was advised by legal not
 8   to -- not to pursue this.
 9           And when I got the package, I said, "I had
10   better not open this, because that's pursuing it."
11           And I sent it straight to Carol.
12      Q.   So when in time did you seek the advice of
13   counsel about how you should handle this unsolicited
14   idea?
15      A.   I don't know exactly.
16      Q.   Was it before you scheduled the meeting or
17   after?
18      A.   It must have been after or I wouldn't have
19   scheduled the meeting; yes.
20      Q.   Now, I think you also testified that
21   something about the mention of "Maidenform" in this
22   E-mail raised concerns on your part about
23   Ms. Zarkadas' idea.
24      A.   Uh-huh.
25      Q.   Can you explain to me what it was about
```

1          Deposition of James Pappas

2                 MR. von SIMSON:  Well, I'm just going

3     to say for the record -- and John, I'll follow up

4     with Mike about this -- that to the extent that that

5     file or whatever was in it was sent to Carol

6     Matorin, it ought to at least be on the privilege

7     log to figure out what the privilege is that was

8     attached to it.

9                 MR. WARD:  It was produced to you.

10                MR. von SIMSON:  The file was

11    produced?

12                MR. WARD:  It was a letter from

13    Ms. Zarkadas with a copy of the patent attached.

14                MR. von SIMSON:  That's the contents

15    of the Carol Matorin file?

16                MR. WARD:  Correct.

17                MR. von SIMSON:  Okay.

18    BY MR. von SIMSON:

19       Q.   I want to go back now to Exhibit 66.  This

20    is the E-mail in which you say to Ms. Kramer, "Keep

21    going with the 100-Ways Bra development.  As of now,

22    we're okay."

23                And we've talked about that at some

24    length.

25                Now, I think, again, what your testimony